# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00875-COA

**ROBERT THOMAS ELMORE**                                                        **APPELLANT**

**v.**

**RACHAEL BELL BEARD ELMORE**                                          **APPELLEE**

DATE OF JUDGMENT:                          05/31/2023
TRIAL JUDGE:                                        HON. CYNTHIA L. BREWER
COURT FROM WHICH APPEALED:    MADISON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:          JOHN G. HOLADAY
ATTORNEY FOR APPELLEE:            DAVID BRIDGES
NATURE OF THE CASE:                   CIVIL - DOMESTIC RELATIONS
DISPOSITION:                                 AFFIRMED - 04/22/2025
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., WESTBROOKS AND WEDDLE, JJ.**

**WEDDLE, J., FOR THE COURT:**

¶1.      After Robert Elmore and Rachael Elmore each sought a divorce on contested grounds,

the parties filed a joint consent to divorce on the ground of irreconcilable differences and

reserved the contested issues of equitable division, alimony, and attorney's fees for the

chancellor to decide. On May 10, 2023, the Madison County Chancery Court entered its

opinion granting the parties a divorce and dividing the marital property, and the court's final

judgment was entered on May 31, 2023, after a status conference was held regarding proof

of value. Aggrieved, Robert appeals. Finding no error, we affirm.

## FACTS

¶2.      Robert and Rachael were married on August 10, 2010. The parties separated in

January 2020 and had no children together.[1] On September 30, 2020, Robert filed a complaint for divorce on the grounds of uncondoned adultery and habitual cruel and inhuman treatment. On January 6, 2021, before Robert served Rachael with process, Rachael filed a complaint for divorce on the grounds of habitual cruel and inhuman treatment and habitual drunkenness. Prior to trial, the chancellor consolidated the causes, determined February 9, 2021, to be the valuation date for marital property, and approved the parties' voluntary consent to divorce and stipulation of issues to be tried. Robert disputed the chancellor's classification of the following assests: RTE Properties LLC, Promissory Notes 2702 and 2709, TBCB Properties LLC, and real and personal property.

**RTE Properties LLC**

¶3.     Prior to the marriage and until 2020, Robert worked at Eutaw Construction Company Inc., a construction business owned by his father, Tom Elmore. In 2004, prior to the marriage, when Tom decided to move his construction business, he and Robert formed Elmore Elmore LLC, with ownership designated as 50% RTE Properties LLC and 50% Elmore Properties Inc. (Tom's business). In 2009, Elmore Elmore LLC acquired land and built a building that Eutaw Construction Company Inc. moved into that same year. When Robert parted ways with Eutaw Construction in 2020, Elmore Elmore LLC was dissolved, and Robert retained his interest in RTE Properties. The chancellor found that RTE Properties was marital property valued at $522,002.07.

**Promissory Notes 2702 and 2709**

---

[1] Robert had two children from a previous relationship.

2

¶4. In 2005, Tom had sold to his daughter and Robert 17% of his ownership interest in Eutaw Construction, totaling 1,508 shares. Until 2019, Robert made periodic payments totaling $190,590.23 toward the purchase price of the shares. In 2012, Tom entered into an Employee Stock Ownership Plan (ESOP) agreement with the employees of Eutaw Construction, which required all stockholders, including Robert, to exchange their stock for promissory notes.[2] In the agreement, Robert, as the payee, received quarterly payments from the ESOP transaction. In 2019, Robert paid the remaining balance of $877,073.87 to Tom for what he owed for the 1,508 shares of the Eutaw Construction stock. During the divorce proceedings, Robert entered into a contract with Tom for the sale of Promissory Notes 2702 and 2709 for $4.2 million. The chancellor ruled the two promissory notes were marital property.

**TBCB Properties LLC**

¶5. After Tom entered into the ESOP agreement, he formed TBCB Properties LLC (TBCB) with others, including Robert, in 2012. A member later sold his ownership interest back to TBCB, which increased Robert's ownership interest to 17.4%. TBCB owned five properties throughout the marriage. As of February 9, 2021, the date of demarcation, the business owned two pieces of property appraised at $1,428,820.00. The chancellor found that Robert's 17.4% ownership interest was valued at $258.010.68, and because TBCB was formed during the marriage, his business interest was marital property.

**Real Property**

---

[2] Tom testified that the promissory notes were "re-amortized in 2017, but they were created in 2012."

3

¶6.    During the marriage, the parties acquired interests in real property, including the marital home, an undeveloped lot in Alabama, and a timeshare in Colorado. No other evidence was heard as to additional real property the parties owned as of the demarcation date.[3] Both parties classified the marital home in Madison, Mississippi, as marital property. After considering the evidence and hearing testimony from witnesses, the chancellor assigned the marital home a value of $1,550,000.00, with a total marital equity in the amount of $297,590.66.

¶7.    Following the trial, the chancellor determined which assets were subject to equitable division and distributed the property accordingly. Aggrieved, Robert appeals this ruling.

## STANDARD OF REVIEW

¶8.    "This Court applies a limited standard of review to a chancellor's division and distribution of marital property. A [chancellor's] findings of fact will not be disturbed unless [the chancellor's] actions were manifestly wrong, [the chancellor] abused [her] discretion, or [the chancellor] applied an erroneous legal standard. The chancellor's division and distribution will be upheld if it is supported by substantial credible evidence." *Warner v. Warner*, 341 So. 3d 152, 159 (¶21) (Miss. Ct. App. 2022) (citations omitted).

## DISCUSSION

¶9.    Robert argues that the chancellor (1) erred by not properly considering and analyzing elements necessary for the equitable distribution of marital assets, (2) erred in making her

---

[3] The chancellor ordered the sale of a condo in Starkville, Mississippi, and a condo in Nashville, Tennessee, with combined net proceeds of $272,747.25 to be deposited into the chancery court's registry.

4

determination of which assets were marital and which were non-marital, and (3) erred when she assessed the value of certain assets, specifically the Promissory Notes 2702 and 2709. To equitably distribute marital property, the chancellor must "(1) classify the parties' assets as marital or separate, (2) value those assets, and (3) equitably divide the marital assets." *Gilmer v. Gilmer* 297 So. 3d 324, 335 (¶33) (Miss. Ct. App. 2020) (citing *Randolph v. Randolph*, 199 So. 3d 1282, 1285 (¶11) (Miss. Ct. App. 2016)). In equitably distributing marital assets, the chancellor must apply the following factors established by the Mississippi Supreme Court in *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994): (1) the contribution to the accumulation of property; (2) the dissipation or prior distribution of assets; (3) the market and emotional value of the assets subject to distribution; (4) the value of assets not subject to distribution; (5) the tax and economic consequences of the distribution; (6) the extent to which property division may eliminate the need for alimony; (7) the financial-security needs of the parties; and (8) any other factor that in equity should be considered. *Id*. at 928.

### I.      Classification of Assets

¶10.    All assets earned or accrued during the course of the marriage are presumed to be marital property. *Bullock v. Bullock*, 218 So. 3d 265, 271 (¶18) (Miss. Ct. App. 2017) (citing *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994)). However, an asset may be classified as nonmarital if it is accrued by means of one spouse's separate funds. *Id*. (citing *Ferguson*, 639 So. 2d at 929). The burden of proof is on the spouse claiming property is separate to rebut this presumption. *Rhodes v. Rhodes*, 52 So. 3d 430, 441 (¶42) (Miss. Ct. App. 2011).

The "burden goes beyond a mere demonstration that the asset was acquired prior to marriage." *Cassell v. Cassell*, 389 So. 3d 305, 311 (¶12) (Miss. 2024).

## A. Classification of Promissory Notes 2702 and 2709

¶11. In his first assignment of error, Robert contends that the trial court erred when it classified Promissory Notes 2702 and 2709 as marital assets.[4] Prior to the marriage, Robert agreed to purchase from Tom an ownership interest in Eutaw Construction for $1,067,664.10. Robert paid $190,590.23 toward the purchase price before he and Rachael married, but he paid the remaining balance of $877,073.87 during the marriage. Tom testified that as the majority stockholder, he made the ultimate decisions. Nonetheless, in 2012, Robert agreed to sell his Eutaw Construction stock as part of the ESOP agreement in exchange for the two promissory notes.[5] The chancellor found that when Robert used marital funds to pay Tom the remaining balance on the Eutaw Construction stock in 2019 and also agreed to exchange his stock for two promissory notes during the marriage, the notes became

---

[4] Notably, during the course of the trial, Robert sold these two promissory notes after the chancellor ordered the parties "not to deplete, sell, assign, transfer, dispense with any asset accumulated by the parties, either jointly or individually during the course of the marriage, except in the ordinary course of business." Robert sold the notes to Tom for less than what the chancellor determined to be the value as of the demarcation date, arguing that the notes were sold in the ordinary course of business.

[5] The dissent correctly points out that property acquired by a spouse in exchange for separate property retains its character as separate property. Deborah H. Bell, *Bell on Mississippi Family Law* § 6:04[1], at 155 (3d ed. 2020). However, "[a]cquisition occurs as payment is made and equity is created." *Id*. at § 6.02[4][b]. Here, Robert did not make the final payment toward the purchase price of the stock until 2019 (after the parties were married).

6

marital property.[6]

¶12.    "It is incumbent upon the parties, and not the chancellor, to prepare evidence touching on matters pertinent to the issues to be tried." *Cannon v. Cannon*, 375 So. 3d 697, 711 (¶45) (Miss. Ct. App. 2023). The burden was on Robert to provide evidence to the court to establish that the promissory notes were not marital property. *See id*. at 710 (¶44). The assets' appreciation is demonstrated by the fact that the promissory notes were valued at $6,389,371.55 as of the demarcation date and that Robert sold them for $4,200,000.00, which was significantly more than the purchase price. This Court has held that marital property includes the appreciation of an asset resulting from either spouse's active efforts during the marriage. *Craft v. Craft*, 825 So. 2d 605, 609 (¶14) (Miss. 2002). The promissory notes were acquired during the parties' marriage through Robert's efforts. Accordingly, we find that the chancellor did not err in her classification of Promissory Notes 2702 and 2709 as marital property.

### B.    Classification of Interest in TBCB

¶13.    As another assignment of error, Robert alleges that the chancellor erred when she determined that his ownership interest in TBCB was marital property subject to equitable distribution. Although it is undisputed that TBCB was formed during the marriage, Robert contends that he obtained his interest in TBCB as a result of his pre-marital ownership of the Eutaw stock. This Court has held that "[a]ssets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such

---

[6] The chancellor took into consideration the premarital funds Robert used toward the purchase price in its *Ferguson* analysis.

assets are attributable to one of the parties' separate estates prior to the marriage or outside of the marriage." *Warner*, 341 So. 3d at 160 (¶23) (quoting *Williams v. Williams*, 303 So. 3d 824, 833 (¶33) (Miss. Ct. App. 2020)). "[T]here is generally a presumption that property acquired during the marriage is marital property." *Cassell*, 389 So. 3d at 310-11 (¶12) (quoting *Yancey v. Yancey*, 752 So. 2d 1006, 1011 (Miss. 1999)). "[T]he party seeking to classify property as separate, or non-marital, bears the burden of tracing the asset to a separate-property source." *Allgood v. Allgood*, 62 So. 3d 443, 447 (¶13) (Miss. Ct. App. 2011).

¶14.     In support of Robert's claim that TBCB was separate property, he offered testimony that TBCB was created during the time Eutaw Construction was sold with the ESOP agreement and was part of the ESOP transaction. Robert essentially re-urges that his interest in Eutaw Construction became his interest in the promissory notes; therefore, because TBCB was created as a result of his interest in Eutaw Construction, according to Robert, TBCB is not marital property. However, Robert did not provide any evidence to support his claim that TBCB was formed as a result of the ESOP agreement. The chancellor, after considering witness testimony, determined that Robert did not rebut the presumption that the business interest is marital property. We agree. A review of the record reflects that Robert failed to meet his burden, and without sufficient evidence to overcome the presumption, the chancellor was obligated to find that the interest in TBCB was marital property. *See Cannon*, 375 So. 3d at 711 (¶47). Accordingly, we find that the chancellor was not erroneous in her classification of the interest in TBCB.

### C. Classification of Interest in RTE Properties

¶15. In Robert's next assignment of error, he argues that the chancellor erred in classifying RTE Properties as marital property. Although Robert formed RTE Properties in 2004, the chancellor found that by using marital funds to pay RTE Properties' debts, the asset's character changed from non-marital to marital. When Robert left Eutaw Construction Company Inc. in 2020, he and his father dissolved Elmore Elmore LLC, and RTE Properties became the sole owner of the two buildings and land, thereby assuming the debt obligations associated with Elmore Elmore LLC. The record shows that Robert refinanced significant debt associated with the land in March 2021. When Eutaw Construction Company Inc. vacated the buildings in April 2020, they remained vacant until November 2021, when Robert leased both buildings and began collecting rent. Robert used his stock payments and a $400,000.00 severance pay to make the note payments and negotiated with the bank for more time. All of this business was conducted during the marriage.

¶16. Robert testified that during the marriage, he used funds from his personal account to pay on the loans for RTE Properties. He argues that because his only source of funds during this time period was from the ESOP transaction, the payment on the loan did not convert RTE Properties to marital property. "A business interest owned prior to marriage is the separate property of the owning spouse, at least to the extent of its value at the time of the marriage." *Smith v. Smith*, 379 So. 3d 954, 965 (¶34) (Miss. Ct. App. 2024) (quoting *Dean v. Dean*, 304 So. 3d 156, 166 (¶35) (Miss. Ct. App. 2020)). "Appreciation of a separate business interest, which occurs during the marriage and is attributable to the efforts of either

9

spouse is marital property." *Id*. In addition to the fact that Robert offered no testimony or evidence as to the source of the funds to pay the loan, only that he did not have significant income during this period of time, we find the chancellor made no reversible error by classifying the promissory notes as marital property. Therefore, we find that the chancellor did not err in classifying the interest in RTE Properties as marital property.

### D. Classification of Personal Property within the Marital Home

¶17. Next, Robert submits that the chancellor erred when she awarded Rachael all the personal property within the marital home. Robert claims that certain personal property in the marital home, including personal property he owned prior to the marriage that belonged to his daughter, was not subject to equitable distribution. There is a rebuttable presumption that all property is marital, and the burden of showing otherwise rests with the spouse claiming the property as non-marital. *Brown v. Brown*, 350 So. 3d 1169, 1178 (¶32) (Miss. Ct. App. 2022) (citing *Neely v. Neely*, 305 So. 3d 164, 168 (¶14) (Miss. Ct. App. 2020)). Robert failed to specify, and the record does not reflect, what personal property he believes was not subject to equitable distribution.

¶18. In her final judgment, the chancellor determined which property was marital, valued the property, and made a distribution. Robert argues that the division of the personal property was inequitable and unjust. Again, "[i]t is within the chancery court's authority to make an equitable division of all jointly acquired real and personal property. This Court reviews a chancery court's division of marital assets for an abuse of discretion. We will not reverse a chancery court's distribution of assets absent a finding that the decision was manifestly

wrong, clearly erroneous, or an erroneous legal standard was applied." *Garner v. Garner*, 343 So. 3d 1097, 1103 (¶31) (Miss. Ct. App. 2022) (citations omitted). After review, we find that the chancellor did not abuse her discretion, and we affirm the chancellor's classification and distribution of personal property in the marital home.

## II. Application of Factors Relating to the Equitable Distribution of the Parties' Assets

¶19. Robert also contends that the chancellor erred in her analysis of the *Ferguson* factors. Specifically, he argues that the chancellor failed to properly consider many of the subject factors and that her weighing of the factors was not properly supported by the record. When "reviewing a chancellor's judgment [in property division,] this Court does not conduct a *Ferguson* analysis anew, but reviews the judgment to ensure that the chancellor followed the appropriate standards and did not abuse [her] discretion." *Goellner v. Goellner*, 11 So. 3d 1251, 1264 (¶45) (Miss. Ct. App. 2009) (quoting *Phillips v. Phillips*, 904 So. 2d 999, 1001 (¶8) (Miss. 2004)). It is important to note that our review of the chancellor's final judgment reveals that she conducted a thorough and deliberate consideration of each *Ferguson* factor and reached a conclusion on each applicable factor. We now address the individual factors Robert disputes.

¶20. Robert alleges that the chancellor failed to give him credit for his role in the accumulation of a majority of the assets during the marriage. A review of the record and the chancellor's final judgment reveals that this allegation lacks merit. As the chancellor notes throughout her final judgment, it is undisputed which assets Robert acquired. He further alleges that the chancellor "adopted wholesale the testimony of Rachael over that of

11

[Robert]." Our Supreme Court has held that "[t]he chancellor, by [her] presence in the courtroom, is best equipped to listen to witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses." *Mabus v. Mabus*, 890 So. 2d 806, 819 (¶56) (Miss. 2003) (citing *Rogers v. Morin*, 791 So. 2d 815, 826 (Miss. 2001)).

¶21.   Robert also alleges the chancellor should have found the following factors favored him: contribution to the stability and harmony of the marital and family relationships; contribution to the education, training, or other accomplishments bearing on the earning power of the spouse accumulating the assets; the degree to which each spouse has expended, withdrawn, or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree, or otherwise; the market value and the emotional value of the assets; the value of the assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift or to an individual spouse; and tax and other economic consequences, to third parties of the proposed distribution. The chancellor's decision was based on the testimony of the parties and their credibility as determined by the court, and we will not reweigh that credibility. *Barnett v. Oathout*, 883 So. 2d 563, 566 (¶6) (Miss. 2004). Thus, we find the chancellor followed the appropriate standards in her application of each *Ferguson* factor and did not abuse her discretion.

   **A.   Determination of the Value of the Promissory Notes 2702 and 2709**

¶22.   Robert argues that the trial court erred in its determination of the value of the

12

Promissory Notes 2702 and 2709. Robert also maintains that the chancellor should not have found the two promissory notes were marital property subject to equitable distribution. Again, we find no reversible error in the chancellor's classification of the two promissory notes as marital property.

¶23. The chancellor determined that the notes were valued at $2,523,839.95 for Promissory Note 2702 and $3,865,531.60 for Promissory Note 2709. "The valuation of property is a question of fact." *Brown*, 350 So. 3d at 1179 (¶32) (citing *Williams*, 303 So. 3d at 833 (¶35)). "Property division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division." *Jenkins v. Jenkins*, 67 So. 3d 5, 13 (¶19) (Miss. Ct. App. 2011) (quoting *King v. King*, 946 So. 2d 395, 403 (¶20) (Miss. Ct. App. 2006)). In the case before us, the chancellor noted in her final judgment that "[t]he parties disagreed on the value of the asset and presented testimony and evidence in support of their position. Rachael offered the expert testimony of Kenny Parker to support her claim as to the value. . . . [Robert] disputed Kenny Parker's valuation but presented neither expert testimony to rebut . . . nor caselaw to support his position." Further, the chancellor's opinion reflects that she used the value of the promissory notes presented at trial and made a determination that is supported by substantial credible evidence. This Court has declined to find that the chancellor abused her discretion if the parties failed to present evidence of value. *See id.*; *see also Common v. Common*, 42 So. 3d 59, 63 (¶13) (Miss. Ct. App. 2010). Therefore, we find that the chancellor made no reversible error in her determination of the value of Promissory Notes 2702 and 2709.

## B. Award of the Marital Home to Rachael

¶24. Robert next submits that the chancellor erred when she awarded the marital home solely to Rachael. After applying the *Ferguson* factors, the chancellor awarded Rachael the exclusive use, possession, and ownership of the marital home, which was valued at $297,590.66 after considering the mortgages. In her opinion, the chancellor noted that Robert made mortgage payments on the marital home during the course of the marriage. However, the chancellor also recognized that "[w]hile [Robert] earned significantly more income, Rachael provided significantly more support within the home." Rachael testified at length about her contributions to the household at the beginning of their marriage, including getting Robert's children ready for school, shopping for groceries, cooking, cleaning, planning the children's birthday parties, et cetera. This Court has held that we "assume for divorce purposes that the contributions and efforts of the marital partners, whether economic, domestic[,] or otherwise[,] are of equal value." *Faerber v. Faerber*, 150 So. 3d 1000, 1007 (¶21) (Miss. Ct. App. 2014). Therefore, we find that the chancellor's award of the marital home to Rachael was not manifestly wrong or clearly erroneous and was supported by substantial credible evidence.

## C. Award of the Timbers Timeshare Condominium in Colorado

¶25. Robert asserts that the chancellor erred when she awarded Rachael the exclusive use, ownership, and possession of their timeshare at the Timbers Condominium in Colorado without applying a credit for Robert against the amounts he paid after the trial. Both parties admitted the Timbers timeshare in Colorado is marital property valued at $50,000.00, less

14

the annual maintenance fee. After accounting for the yearly assessment fee, the chancellor valued the timeshare at $36,000.00. From the trial date until the chancellor's ruling, Robert made payments on the timeshare totaling $9,226.44, which he believes should be credited against his property division payments. We have consistently found that "in the absence of meaningful argument and citation of authority, appellate courts generally will not consider the assignment of error." *Mazie v. Boozier-Mazie*, No. 2023-CA-00470-COA, 2024 WL 4354009, at *5 (¶21) (Miss. Ct. App. Oct. 1, 2024) (quoting *Patton v. State*, 109 So. 3d 66, 75 (¶22) (Miss. 2012)). Robert did not support his assertion with authority; therefore, this issue is procedurally barred.

### D.      Award of the LPL Financial Accounts

¶26.    The chancellor awarded Rachael two accounts with LPL Financial valued at a combined $58,610.00. Robert alleges that this award was erroneous, arguing the accounts accrued because of him over the course of his employment at Eutaw Construction, which began before he was married to Rachael. For the purposes of dividing marital property, retirement plans are considered marital assets. *See Coggin v. Coggin*, 837 So. 2d 772, 775 (¶5) (Miss. Ct. App. 2003). This Court has found that when there is no evidence presented to show the value at the time of the separation and the value prior to the marriage, we will find no error in the chancellor's finding, as "fairness was the prevailing guideline in this marital division." *Stewart v. Stewart*, 2 So. 3d 770, 775 (¶14) (Miss. Ct. App. 2009). We find the chancellor's award of the LPL Financial accounts to Rachael was not manifestly wrong or clearly erroneous and was supported by substantial credible evidence.

### E. Classification of Engagement Ring Purchased after the Marriage

¶27. Robert argues that the chancellor erred in determining that the engagement ring he bought for Rachael was separate property. Specifically, he alleges that since the ring was purchased four years into the marriage, the ring should have been classified as marital property subject to equitable distribution. The chancellor held that the engagement ring was a gift to Rachael and, therefore, was separate property not subject to equitable distribution. This Court has held that gifts of jewelry between spouses, even if acquired during the marriage with marital assets, are personal gifts and are the separate personal property of the donee. *Fleishhacker v. Fleishhacker*, 39 So. 3d 904, 914 (¶48) (Miss. Ct. App. 2009). After review, we find the chancellor's award of the engagement ring to Rachael was not manifestly wrong or clearly erroneous and was supported by substantial credible evidence.

### III. Denial of Motion for New Trial or to Alter or Amend

¶28. In Robert's final assignment of error, he asserts that the chancellor erred when she denied his Rule 59 motion for a new trial or, in the alternative, to "open the judgment," take additional testimony, and alter or amend the final judgment. *See* M.R.C.P. 59. This Court reviews the denial of a Rule 59 motion for an abuse of discretion. *Gossett v. Gossett*, 313 So. 3d 1063, 1073 (¶33) (Miss. Ct. App. 2021) (citing *Miller v. Smith*, 229 So. 3d 148, 154 (¶27) (Miss. Ct. App. 2016)). "A party may only obtain relief on a Rule 59 motion upon showing: (1) 'an intervening change in controlling law,' (2) 'availability of new evidence not previously available,' or (3) the 'need to correct a clear error of law or to prevent manifest injustice.'" *Id*. (quoting *Miller*, 229 So. 3d at 154-55 (¶27)). Under Rule 59, the chancellor

16

has discretion to grant a new trial or to amend the judgment "if convinced that a mistake of law or fact has been made, or that injustice would attend allowing the judgment to stand." *Id*. (quoting *McNeese v. McNeese*, 119 So. 3d 264, 272 (¶20) (Miss. 2013)). Robert failed to meet any of the requirements to obtain relief on a Rule 59 motion. Consequently, we find the chancellor did not abuse her discretion when she denied his motion.

¶29.     Additionally, Robert produced a sworn "Matrimonial Agreement" in which Rachael allegedly acknowledged that the disputed Eutaw Construction stock was Robert's separate asset. He argues that the chancellor erred by refusing to consider the newly discovered evidence and alter or amend her finding that Promissory Notes 2702 and 2709, which originated from Robert's Eutaw Construction stock, were marital property. The chancellor found that Robert failed to meet his burden of proof regarding the Matrimonial Agreement,[7] and we agree. This Court has stated that a motion for a new trial under Rule 59 based on newly discovered evidence "is an extraordinary motion, and the requirements of the rule must be strictly met." *Smullins v. Smullins*, 77 So. 3d 119, 125 (¶23) (Miss. Ct. App. 2011). "A party cannot fail to investigate important information and then attempt to assert that information as new evidence at the end of the trial." *Id*. at 127 (¶34) (quoting *Goode v. Synergy Corp.*, 852 So. 2d 661, 664 (¶12) (Miss. Ct. App. 2003)). The chancellor correctly pointed out that Robert knew about the agreements but never mentioned them, never offered them into evidence, and never showed that the evidence was unavailable at the time of trial. After review, we find the chancellor did not abuse her discretion when she denied Robert's

---

[7] The chancellor acknowledged another document Robert alleged the parties signed, titled "Agreement to Terminate Matrimonial Agreement."

motion for a new trial or to alter or amend the judgment.

## CONCLUSION

¶30.    We find the chancellor did not err in the classification and distribution of marital assets. We also find that the chancellor did not abuse her discretion in denying Robert's motion for a new trial or to alter or amend the judgment.

¶31.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. ST. PÉ, J., NOT PARTICIPATING.**

**WILSON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶32.    For the reasons discussed below, I would hold that the chancellor erred by classifying the ESOP promissory notes and Robert's interest in TBCB as marital property. I would reverse the chancellor's property division and remand for further proceedings. Accordingly, I respectfully dissent in part.

### *Eutaw Construction Shares/ESOP Promissory Notes*

¶33.    In 2005—five years before Robert married Rachael—Robert's father, Tom, gave Robert 1,508 shares of Eutaw Construction stock, a seventeen percent interest in the company. In exchange, Robert executed a promissory note for $1,067,664. In or around 2005, Robert received additional shares for no additional payment when another shareholder left the company. When Robert married Rachael in August 2010, Robert owed Tom $877,073.87 on the promissory note. Thus, Robert paid about $190,000 in principal on the note before he married Rachael. In January 2011, Robert made another $70,000 payment on

18

the note. Robert testified without contradiction that he made the payment directly from a distribution he received as a Eutaw shareholder. In 2012, Eutaw created an employee stock ownership program (ESOP), and the company's owners, including Robert, sold their shares to the ESOP. In return for their shares, Robert and other shareholders received promissory notes from the ESOP. Thereafter, Robert used payments he received on his ESOP promissory notes (Nos. 2702 and 2709) to continue making payments to Tom on the 2005 promissory note. As part of a 2019 transaction with Tom, Robert agreed to pay Tom the remaining balance on the 2005 promissory note. Robert paid off the 2005 note with the proceeds of a loan from Trustmark. Trustmark required Robert to direct deposit payments he received on his ESOP notes into a Trustmark savings account, which Trustmark then automatically debited for Robert's payments on the Trustmark loan. Finally, in 2021—after the entry of a temporary order in this case, which the chancellor used as the date of demarcation[8]—Robert sold his ESOP promissory notes to Tom for $4,200,000. Robert used some of the proceeds to pay off the remaining balance on the Trustmark loan ($521,949.21). Thus, Robert's original (2005) debt to Tom was eventually repaid from a combination of Eutaw shareholder distributions, payments Robert received from the ESOP promissory notes, and proceeds from Robert's 2021 sale of the ESOP promissory notes.

¶34. Regarding a business interest owned prior to a marriage, this Court has stated:

> "A business interest owned prior to marriage is the separate property of the owning spouse, at least to the extent of its value at the time of the marriage."

---

[8] *Cuccia v. Cuccia*, 90 So. 3d 1228, 1233 (¶8) (Miss. 2012) ("[A] temporary support order may serve as a line of demarcation in determining whether property is marital or separate.").

19

Deborah H. Bell, *Bell on Mississippi Family Law* § 8.03[2] (citing *Craft v. Craft*, 825 So. 2d 605, 609 (¶14) (Miss. 2002)). Appreciation of a separate business interest, which occurs during the marriage and is attributable to the efforts of either spouse, is marital property. *Id.* at § 8.03[3][b] (citing *Craft*, 825 So. 2d at 609 (¶14)). *The burden of proof is on the non-owning spouse to show both the appreciation in value of the separate business interest and that such appreciation was attributable to the efforts of either spouse. Waring v. Waring*, 747 So. 2d 252, 256 (¶18) (Miss. 1999).

*Dean v. Dean*, 304 So. 3d 156, 166 (¶36) (Miss. Ct. App. 2020) (quoting *Kimbrough v. Kimbrough*, 76 So. 3d 715, 720 (¶22) (Miss. Ct. App. 2011)). "Appreciation that is merely passive and not a result of either spouse's active efforts remains separate property." *Rhodes v. Rhodes*, 52 So. 3d 430, 436 (¶20) (Miss. Ct. App. 2011). In addition, property acquired by a spouse in exchange for separate property retains its character as separate property. Deborah H. Bell, *Bell on Mississippi Family Law* § 6:04[1], at 155 (3d ed. 2020).

¶35. Here, Robert acquired his Eutaw shares five years before he married Rachael, and he later exchanged the shares for the ESOP promissory notes. During the marriage, Robert made payments to Tom on the 2005 promissory note, which he originally executed in exchange for the Eutaw shares. However, Robert testified without contradiction that he made those payments using shareholder distributions and payments from the ESOP promissory notes. There is no evidence in the record that Robert ever used *marital* funds to make payments on the 2005 promissory note. Finally, Rachael presented no evidence that the value of Robert's interest in Eutaw appreciated during the marriage "*and that such appreciation was attributable to [Robert's] efforts*." *Dean*, 304 So. 3d at 166 (¶36) (quoting *Kimbrough*, 76 So. 3d at 720 (¶22)).[9] On this record, Robert's Eutaw shares and the ESOP

___

[9] Note that only about two years passed between the date of the marriage (2010) and

20

notes remained Robert's separate property.

¶36.    To take a step back, when Robert received the Eutaw shares from his father in 2005, he executed a promissory note for $1,067,664. There is no evidence that the note, executed as part of a father-son transfer of an ownership interest in a family business, reflected the fair market value of the shares Robert received. Regardless, the evidence shows that Robert paid about $190,000 on the note before the marriage and then paid a total of about $350,000 on the note between the date of the marriage and the date of demarcation. As stated above, there is no evidence that Robert used marital funds to make those payments or that the Eutaw shares or ESOP promissory notes appreciated in value as a result of Robert's efforts during the marriage. Nonetheless, the chancellor found that the ESOP promissory notes were a *100% marital asset worth $6,389,371.55*[10] and ordered Robert to pay Rachael $3,000,000 as part of the property division. The evidence in the record simply cannot justify this result.

### TBCB Properties

¶37.    TBCB LLC was created in 2012 when the former owners of Eutaw Construction sold

---

the date Robert exchanged his Eutaw shares for ESOP notes (2012). During those two years, Robert worked at Eutaw, but he was not yet president of the company. There is no evidence that Robert's efforts as a Eutaw employee from 2010 to 2012 did anything to cause Eutaw's stock to increase in value. Moreover, there is no evidence that Robert's efforts from 2012 to 2020 had any impact on the value of the ESOP *promissory notes*, which were subject to contractual repayment terms. Finally, the mere fact that Robert made payments to Tom on the 2005 promissory note had no effect on the value of Eutaw Construction or the ESOP promissory notes.

[10] Robert sold the notes to Tom for $4,200,000. Tom testified that he bought the notes at a discount because he was assuming the risk of nonpayment. Rachael's expert testified that the true value of the notes was more than fifty percent higher ($6,389,371.55). The chancellor accepted Rachael's expert's valuation.

21

their shares to the ESOP. "TBCB" is an acronym for Eutaw's four owners at the time—Tom, Bobby (Robert), Cindy, and Bill. As described by Tom and Robert, Eutaw essentially spun off certain real estate to TBCB before it created the ESOP. Each of Eutaw's owners received an ownership interest in TBCB equal to their ownership interest in Eutaw. Since Robert received his ownership interest in TBCB as a partial distribution of his former ownership interest in Eutaw, his interest in TBCB is also separate property. Bell, *supra*, § 6:04[1], at 155. The chancellor stated TBCB was presumed to be marital property because it was formed during the marriage, and Robert "failed to rebut the presumption." However, Tom and Robert's testimony was uncontradicted and clearly established that Robert's ownership in TBCB is his separate property.[11]

---

[11] The chancellor valued Robert's 17.4% interest in TBCB at $258,010.68.

22